IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| CAROLYN M. NICHOLSON, | CASE NO. 1:25-cv-2257 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff Carolyn Nicholson filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 9. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In July 2023, Nicholson filed applications for disability insurance benefits and supplemental security income, alleging a disability onset date of April 19, 2023.[1] Tr. 17, 236. In her applications, Nicholson claimed disability due to generalized anxiety disorder and post-traumatic stress disorder (PTSD).

---

[1]  "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Tr. 291. The Social Security Administration denied Nicholson's applications and her motion for reconsideration. Tr. 103–04, 123–24. Nicholson then requested a hearing before an Administrative Law Judge (ALJ). Tr. 182.

In January 2025, an ALJ held a hearing, during which Nicholson and a vocational expert testified. Tr. 38–73. In March 2025, the ALJ issued a written decision finding that Nicholson was not disabled. Tr. 17–32. The ALJ's decision became final on September 8, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Nicholson filed this action on October 21, 2025. Doc. 1. She asserts the following assignments of error:

> 1.  The ALJ's RFC determination is unsupported by substantial evidence due to his failure to properly evaluate the opinions from Dr. Bell related to the mental RFC and Dr. Yakubek related to the physical RFC.
>
> 2.  The ALJ's Step Five determination is unsupported by substantial evidence because given the RFC, the VE testified Plaintiff would be disabled.

Doc. 10, at 3.

### Evidence

*Personal and vocational evidence*

Nicholson was 58 years old on her alleged disability onset date. Tr. 30. She graduated from high school and last worked in April 2023 as an Amazon warehouse worker. Tr. 48.

2

*Relevant medical evidence*

In January 2023, Nicholson saw her primary care doctor, Jerry Bell, D.O., for a medication refill. Tr. 375. Depression screening showed a score of zero and Nicholson denied feeling down, depressed, or hopeless. Tr. 375. Nicholson's physical and mental status exam findings were unremarkable. Tr. 376. Dr. Bell assessed hypothyroidism, anxiety, and rheumatoid arthritis and refilled Nicholson's medications. Tr. 376, 379.

The same day, Dr. Bell completed a form for Nicholson's employer excusing Nicholson from work for two days in early January. Tr. 420. Dr. Bell listed Nicholson's diagnoses as rheumatoid arthritis and anxiety. Tr. 420. He wrote that Nicholson could not work these two days due to "office contact … pertaining to medication, etc." Tr. 420.

On May 15, 2023, Brown had a telemedicine appointment with Dr. Bell for anxiety. Tr. 372. Depression screening showed a score of zero and Nicholson denied feeling down, depressed, or hopeless. Tr. 372. Nicholson told Dr. Bell that she was on "[w]ork leave due to anxiety and extenuating life circumstances starting … April 19, 2023 and she will plan to return to work … May 22, 2023." Tr. 372. Dr. Bell wrote that Nicholson "has had extreme situations dealing with living environment (losing her apartment, etc) increased stress [and] increased anxiety." Tr. 373. She "has had excessive stress which has affected her emotionally and physically." Tr 373. On exam, Nicholson's affect was anxious and Dr. Bell diagnosed anxiety. Tr. 373.

In August 2023, Nicholson followed up with Dr. Bell for "anxiety paperwork." Tr. 369. Depression screening showed a score of zero and Nicholson denied feeling down, depressed, or hopeless. Tr. 369. She reported a pain level of zero. Tr. 369. Nicholson's affect was appropriate and she was oriented to person, place, and time. Tr. 370. Dr. Bell diagnosed anxiety, PTSD, hypothyroidism, and gastroesophageal reflux disease. Tr. 370. He refilled her medications. Tr. 370.

The same day, Dr. Bell completed a form called "medical opinion— psychological conditions" on Nicholson's behalf. Tr. 395. Dr. Bell indicated that he began treating Nicholson in 2016 and had treated her for anxiety, PTSD, acid reflux, hypothyroidism, and depression. Tr. 395. He checked boxes indicating that Nicholson's signs of depression included anhedonia, appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating or thinking, and thoughts of suicide. Tr. 395. Nicholson's signs of anxiety were "[a]pprehensive expectation" and "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." Tr. 395. Dr. Bell opined that Nicholson was "overall" "mildly limited" in her ability to understand, remember, or apply information. Tr. 395. When asked to break down Nicholson's understanding and short- and long-term memory, Dr. Bell wrote that Nicholson had no limitations "until she feels stressed or nervous." Tr. 395. Dr. Bell indicated that Nicholson could "understand and carry out very short and simple instructions" and "detailed but uninvolved written or oral

4

instructions." Tr. 396. When asked for examples of Nicholson's limitations, Dr. Bell wrote that Nicholson "has had problems with friends/family causing 'let down,' mistrust. [She] [h]as problems trusting people even in day to day environment." Tr. 395.

Dr. Bell opined that Nicholson was markedly limited in her ability to interact with others and that she could sometimes, but not consistently, work with the general public, coworkers, and supervisors. Tr. 396–97. She would need positive reinforcement from supervisors to handle stress and emotions. Tr. 397. She "has constant stressors and problems with trust, sometimes is focused." Tr. 397. Nicholson was markedly limited, "when stressed," in her ability to concentrate, persist, or maintain pace. Tr. 397. When stressed, she could maintain attention and concentration for 30 minutes before needing redirection. Tr. 397. When stressed, her symptoms would cause her to be off-task greater than 25 percent of the workday. Tr. 397. Nicholson couldn't maintain regular attendance and be punctual within customary tolerances, and Dr. Bell explained that Nicholson has "severe anxiety at times." Tr. 397.

Dr. Bell opined that Nicholson was markedly limited in her ability to adapt or manage herself "due to anxiety (PTSD)," and that she could sometimes, but not consistently, maintain socially appropriate behavior. Tr. 397–98. He explained that Nicholson "may become withdrawn or very emotional due to anxiety." Tt. 398. She could sometimes, but not consistently, respond appropriately to changes in the work setting because of stress, anxiety,

5

and PTSD. Tr. 398. Finally, Dr. Bell said that because of anxiety and stress, Nicholson would miss more than four days of work per month. Tr. 398.

In January 2024, Nicholson saw Jinhui Wang, Psy.D., for a virtual psychological consultative exam. Tr. 434. Nicholson told Dr. Wang that she had severe anxiety and didn't like being "around people, a crowd of people." Tr. 435. She had a hard time concentrating—she had "a ton of thoughts through [her] head" and would forget what she was doing. Tr. 435. Nicholson said that due to her conditions, at work she couldn't concentrate, she was hyper, she couldn't stand still, and she had "100 moods a day." Tr. 436. She lashed out when coping with work pressure and sometimes she left work. Tr. 436. She got along well with supervisors and got along with coworkers and "just worked, stayed to [her]self." Tr. 436. Nicholson told Dr. Wang that she suffered from these conditions for "all [her] life," and that she had tried individual therapy and medications, but neither helped. Tr. 435. At the time of the exam, Nicholson said that she was looking for work and had applied to 40 jobs without success. Tr. 436. At home, she performed household chores, socialized with her ex-husband and son, and communicated with friends by telephone. Tr. 436.

Dr. Wang described Nicholson as cooperative with average social skills. Tr. 437. She had normal speech and thought content. Tr. 437. She appeared sad and anxious, with "[s]ome behavioral or autonomic signs of anxiety … observed as tense facial expression, and tense vocalization." Tr. 437. Dr. Wang found that Nicholson was alert and responsive and had intact memory,

6

attention, and concentration. Tr. 437. She had satisfactory persistence, adequate pace, and intact insight and judgment. Tr. 437–38. Dr. Wang diagnosed Nicholson with unspecified depressive disorder and unspecified anxiety disorder. Tr. 438. She opined that Nicholson could be "expected to be able to understand, remember, and carry out instructions in a work setting." Tr. 438–39. If Nicholson's depressive and anxiety symptoms were to worsen, "they could negatively impact" her ability to maintain concentration, persistence, or pace "by interfering with her ability to focus and concentrate." Tr. 439. Nicholson "maintained [a] certain capacity" in her ability to respond appropriately to supervision and coworkers in a work setting. Tr. 439. And regarding Nicholson's abilities to respond appropriately to work pressures, Dr. Wang wrote that Nicholson "has depressive and anxiety symptoms so these could lower her frustration tolerance and put her a bit at risk for workplace pressure at this time." Tr. 439.

In July 2024, Nicholson saw George Yakubek, M.D., for a physical consultative examination. Tr. 442. Nicholson said that she experienced neck and back pain "for years." Tr. 443. Activity exacerbated her pain, which she rated a six out of ten, at worst, in severity. Tr. 443. Nonsteroidal anti-inflammatory drugs had not provided relief. Tr. 443. Nicholson had not tried injections or physical therapy. Tr. 443. On exam, Nicholson had mild tenderness to palpation in her thoracic spine. Tr. 445. She had full strength in all of her muscle groups and full range of motion in all areas. Tr. 448–52. She

7

had normal reflexes and sensation and a normal gait. Tr. 445. Nicholson could squat and rise from that position "with ease" and had "no difficulty getting up and down from the exam table." Tr. 445. She could lift and carry light objects. Tr. 445. Nicholson had appropriate speech and eye contact, an appropriate mood, and normal memory and concentration. Tr. 444. Dr. Yakubek opined that "[w]ith [Nicholson's] history of RA, back pain, ADHD, anxiety, depression, PTSD based on the exam findings today," she was "able to sitting couple hours minutes, standing couple h[ou]rs, walking couple blocks, and lifting 10 pounds."[2] Tr. 446. He commented that Nicholson had no "substantial physical limitations" and that "[h]er medical conditions seem well controlled on current medications and there are no acute symptoms that would suggest otherwise." Tr. 446.

In September 2024, Nicholson saw licensed counselor Telisa Cross for an evaluation. Tr. 523. Nicholson reported a history of depression, anxiety, ADHD, and trauma. Tr. 523. She said that she had severe anxiety, causing her to take a leave of absence from her job at an Amazon Warehouse. Tr. 523. Nicholson completed a self-scoring functional impairment survey, which indicated "high" severity in the following areas: "[d]epression/[f]unctioning"; interpersonal relationships; self-harm; emotional lability; and psychosis. Tr.

---

[2]     Dr. Yakubek's statement that Nicholson was "able sitting couple hours minutes," Tr. 446, contains some obvious scrivener's errors. But the context does not allow the Court to infer whether he thought that Nicholson could sit for a couple of hours or for a couple of minutes.

525. She listed her depressive symptoms as sadness, hopelessness, thoughts of death, low self-esteem, and social isolation and withdrawal. Tr. 526. Nicholson's anxiety symptoms were nervousness, hypervigilance, uneasiness, worry, poor concentration, racing thoughts, intrusive thoughts, and avoidance. Tr. 526. Nicholson also reported social anxiety, trauma, phobia, and attention and hyperactive symptoms. Tr. 526. On exam, Cross found that Nicholson had good eye contact; restless motor activity; pressured speech; a depressed, anxious, and worried mood; and a circumstantial thought process. Tr. 528. She had appropriate demeanor, insight, and judgment. Tr. 528. Cross diagnosed Nicholson with major depressive disorder, recurrent, moderate; generalized anxiety disorder; PTSD; and attention deficit hyperactivity disorder (ADHD). Tr. 528. She referred Nicholson for individual counseling and psychiatry. Tr. 530.

Later that month, Nicholson saw Nurse Practitioner Theresa Davies. Tr. 508. Nicholson complained of acid reflux, stated that she was out of her hypothyroid medication, and commented that she used to receive injections for rheumatoid arthritis. Tr. 509. She hadn't seen her rheumatology doctor in a few years. Tr. 465. Nicholson's physical and mental exam findings were normal. Tr. 511. Davies re-started Nicholson's hypothyroid medication, prescribed acid-reflux medication, and referred Nicholson to rheumatology. Tr. 507–08.

*State agency opinions*[3]

In January 2024, Joan Williams, Ph.D., reviewed Nicholson's record. Tr. 88–90. Regarding Nicholson's residual functional capacity (RFC),[4] Dr. Williams found that Nicholson could interact with coworkers, supervisors, and the public "in situations that do not require conflict resolution or persuading others to buy products or services." Tr. 92. She could respond appropriately in a work setting with consistent and predictable expectations and work duties. Tr. 92. In April 2024, Stacy Flowers, Ph.D., reviewed Nicholson's record and affirmed Dr. Williams's findings. Tr. 120.

In April 2024, W. Scott Bolz, M.D., found that Nicholson had no severe physical impairments and, therefore, he did not set out any work-related limitations. Tr. 127. In May 2024, King Leong, M.D., affirmed Dr. Bolz's findings. Tr. 144.

---

[3] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[4] An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

*Hearing testimony*

Nicholson, who was represented by counsel, testified at the telephonic administrative hearing held in January 2025. Nicholson described her past job readying items for shipment at an Amazon warehouse. Tr. 48–49. She said that she was on her feet for entire ten-hour shifts and she lifted up to 50 pounds. Tr. 49–50. When asked why she was unable to work, Nicholson said that her feet cramp and "ball up" due to her rheumatoid arthritis. Tr. 50. She had to wear steel-toed shoes at Amazon, so she would have to take her boots off "for a minute" when her feet "cramp[ed] up" and couldn't work during that time. Tr. 50. This made her anxious because "everything's timed and numbered" at Amazon. Tr. 50. When Nicholson gets irritable, she yells at people. Tr. 50. Her joints hurt, her hands cramp, she becomes anxious about meeting "[her] numbers," and she leaves work. Tr. 50.

Nicholson said that she experiences pain in her feet, ankles, knees, fingers, knuckles, wrists, hands, and neck. Tr. 51. She has degenerative disc disease in her lower back. Tr. 51. She's had rheumatoid arthritis for a number of years, and she tried to work through it. Tr. 51. Nicholson estimated that she spent 50 percent of her day in pain. Tr. 51. Her pain is bad in the morning and at night, and she rated it a six-out-of-ten with medication and an eight-out-of-ten without medication. Tr. 51-52. Nicholson said that she can comfortably sit for two to three hours and stand for an hour. Tr. 52. She can walk for twenty

11

minutes. Tr. 52. She can lift ten pounds, and explained that she can't lift 50 pounds anymore because she "lost all [her] body strength." Tr. 53.

Nicholson stated that she used to receive injections for rheumatoid arthritis, but now she only takes Ibuprofen because she lost her insurance when she got divorced. Tr. 57. She hasn't seen her rheumatologist since 2019, but she had an appointment ten days after the hearing to see her again. Tr. 58. Nicholson explained that when her anxiety and stress increase, her rheumatoid arthritis flares up. Tr. 58. It feels like she has the flu—every muscle and joint hurts. Tr. 58. She takes muscle relaxants for muscle cramps. Tr. 59.

Nicholson testified that some days she can't go outside because she is paranoid. Tr. 57. She has problems sleeping. Tr. 57. Anxiety prevents her from entering a room with 35 to 50 people. Tr. 60. If people line up behind her at the grocery store, she gets panic attacks because she's nervous that she's holding others up. Tr. 61. Nicholson takes medication for anxiety, but it makes her tired. Tr. 59.

The ALJ discussed with the vocational expert Nicholson's past work as an order picker and order filler. Tr. 65. The ALJ asked the vocational expert to determine whether a hypothetical individual with Nicholson's age, education, and work experience could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 65, 67. The vocational expert answered that such an individual could not perform

Nicholson's past work but could perform the following jobs: linen room attendant, housecleaner, and cook helper. Tr. 65–67. The ALJ asked follow-up questions regarding off-task behavior and absenteeism. Tr. 67–68.

Next, Nicholson's attorney asked the vocational expert whether "these jobs" would require greater than occasional interaction with supervisors and coworkers during a training period. Tr. 68. The vocational expert explained that there is "more interaction" during the training period because there's "usually a buddy system for at least two weeks" while the worker gets acclimated to the work environment. Tr. 68. The vocational expert confirmed that "it could be more than occasional interaction" during a training period. Tr. 68.

### The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.
>
> 2. The claimant has not engaged in substantial gainful activity since April 19, 2023, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: rheumatoid arthritis, restless leg syndrome, hypothyroidism, gastrointestinal reflux disease, osteoporosis, depression, anxiety disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she has the ability to understand, remember and carry out simple instructions. She can use her judgment to make simple work-related decisions. She cannot perform work requiring a specific production rate (for example assembly line work). She can deal with occasional changes in a routine work setting and [is] able to occasionally interact with supervisors, coworkers, and the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was … 58 years old, which is defined as an individual of advanced age, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching retirement age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

14

national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 19, 2023, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 19–32.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

15

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*

16

*v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not err when he evaluated the opinion evidence*

Nicholson argues that the ALJ failed to properly evaluate the opinions of Drs. Bell and Yacubek. Doc. 10, at 11.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Nicholson argues that "the ALJ completely mischaracterized the record in Dr. Bell's supportability and consistency analysis to improperly discount" Dr. Bell's opinion. Doc. 10, at 13. The ALJ detailed Dr. Bell's August 2023 opinion, in which Dr. Bell found that Nicholson was markedly limited in three areas of functioning due to anxiety or stress, Tr. 27–28, and explained:

> The opinion from Dr. Bell was not persuasive since the mental status evaluations performed by Dr. Bell indicated the claimant was alert and oriented. There was no evidence the claimant had depression or anxiety. The claimant presented in no apparent distress. Furthermore, the claimant did not advise the physician that the medication was not effective in treating her symptoms and wanted to change medications (1F). Moreover, while the consultative psychologist noted some anxiety and depression, there was no evidence the claimant had significant limitations in her functioning which was inconsistent with the marked limitations Dr. Bell opined (2F: 4F).

Tr. 28.

Nicholson first argues that it is "simply untrue" that Dr. Bell's evaluations indicated that Nicholson "was alert and oriented" with "no evidence" of "depression or anxiety," as the ALJ found. Doc. 10, at 15. In support, she cites Dr. Bell's August 2023 treatment note indicating that she told Dr. Bell that she had anxiety and was stressed, and Dr. Bell's January 2023 off-work statement. *Id.* (citing Tr. 372–73, 420). Dr. Bell's off-work statement didn't list any exam findings, despite the form inviting Dr. Bell to

do so.[5] Tr. 420. On this form, Dr. Bell cited Nicholson's primary diagnosis as arthritis and her secondary diagnosis as anxiety. Tr. 420. In support of his statement that Nicholson had been off work for two days earlier that month, Dr. Bell wrote that Nicholson contacted his office "pertaining to medication, etc." Tr. 420. So there is no indication in this note that Dr. Bell wrote that Nicholson was off work due to anxiety, let alone any objective exam findings supporting the off-work statement.

And Nicholson's reference to statements that she made to Dr. Bell, Doc. 10, at 15, are not Dr. Bell's own observations during mental exam testing. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016) ("Regardless of any inherent subjectivity in the field of psychiatry, a doctor cannot simply report what his patient says and re-package it as an opinion."). Nicholson hasn't identified a treatment note showing that Dr. Bell found her to be not oriented. Nicholson regularly scored a zero on her depression screenings at her visits with Dr. Bell. Tr. 369, 372, 375. And while it is true that once in August 2023, Dr. Bell observed Nicholson to have an anxious affect, that day she was also oriented to person, place, and time, and she was pleasant, well-appearing, and in no acute distress, Tr. 373, as the ALJ noted, Tr. 28. In other words, despite Nicholson's anxious affect, she remained oriented and not distressed— she did not present with the "marked distress" that Dr. Bell opined Nicholson

---

[5] The ALJ separately evaluated Dr. Bell's May 2023 off-work statement, Tr. 27, which Nicholson does not challenge.

at times would display. Tr. 395. The ALJ acknowledged that Nicholson had been diagnosed with anxiety, depression, PTSD, and ADHD, Tr. 20; recognized that these impairments caused moderate, rather than marked, functional limitations, Tr. 29; and assessed RFC limitations to accommodate Nicholson's moderate mental limitations, Tr. 23, 29.

Nicholson complains that the ALJ criticized her for not advising Dr. Bell that her medication was not effective. Doc. 10, at 15–16. But Nicholson's treatment relationship with her primary care doctor, including the fact that her treatment was conservative, is an appropriate factor for the ALJ to consider. *See* 20 C.F.R. § 416.920c(c)(3); *see also Hopkins v. Comm'r of Soc. Sec.*, No. 23-5696, 2024 WL 3688302, at \*4 (6th Cir. Apr. 9, 2024) (finding that the ALJ properly discounted a medical opinion based on "the conservative level of treatment received"); *Blacha v. Sec'y of Health & Hum. Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (claimant's failure to seek treatment undercut complaints of disabling symptoms); *see also Jackson v. Saul*, No. CV 6:19-272, 2020 WL 3037218, at \*5 (E.D. Ky. June 5, 2020) (commenting that the doctor's "failure to pursue more aggressive treatment for … back pain does question the doctor's Medical Source Statement findings given his knowledge of the impairment."). And the ALJ's comment about Nicholson's medication regime is consistent with his observations elsewhere in his decision that: Nicholson's treatment for her impairments was conservative, Tr. 24; she had gaps in treatment, Tr. 24, 28; she at times ran out of her medications, Tr. 25, 28; and there was no record

21

evidence that she pursued or maintained specialized treatment for rheumatoid arthritis or mental health conditions.[6] Tr. 25, 27, 29.

Nicholson submits that "Dr. Bell had a supporting explanation for nearly every aspect of his opinion, and the ALJ completely failed to consider his supporting explanations behind Dr. Bell's opinions." Doc. 10, at 16. But all of Dr. Bell's explanations described what Nicholson told him. Tr. 396–98. The ALJ explained that, despite Dr. Bell's assessed marked limitations, his opinion was not supported by his own exam findings. Tr. 28. Nicholson hasn't identified treatment notes showing that Dr. Bell observed Nicholson to exhibit the behavior he described in his opinion.

Next, Nicholson argues that the ALJ's consistency evaluation of Dr. Bell's opinion, which he contrasted with Dr. Wang's opinion, was faulty. Doc. 10, at 16–17. She claims that the ALJ "mischaracterize[ed]" Dr. Wang's opinion, and that Dr. Wang's opinion "was far more significant than the ALJ suggests" and "does in fact show significant limitations to functioning." *Id*. at 17. Nicholson doesn't challenge the ALJ's evaluation of Dr. Wang's opinion— only the ALJ's use of Dr. Wang's evaluation to show that Dr. Bell's opinion was inconsistent with other evidence in the record. *Id*.

---

[6] In September 2024, Nurse Davies referred Nicholson to rheumatology, Tr. 508, and Nicholson testified at the late January 2025 hearing that she had an upcoming rheumatology appointment in early February 2025, Tr. 58. No treatment notes were added to Nicholson's record, despite the ALJ's invitation to do so or request more time if needed. Tr. 17, 44–45.

22

The ALJ did not mischaracterize Dr. Wang's opinion. The ALJ explained that Dr. Wang wrote that Nicholson understood and remembered questions during the consultative exam and "was expected to be able to understand, remember and carry out instructions in the work setting." Tr. 28, 438–39. The ALJ noted that Dr. Wang found Nicholson's concentration and persistence to be "satisfactory," that Nicholson "was able to remain on task and worked at an adequate pace for all clinical interactions during the evaluation," and that if her depressive and anxiety symptoms worsened, "they could … interfere[e] with her ability to focus and concentrate." Tr. 28, 439. The ALJ wrote that Nicholson showed average social skills during the exam, said that she got along well with work supervisors, and that Dr. Wang opined that Nicholson "maintained certain capacity in this area." Tr. 28, 439. Finally, the ALJ commented that Dr. Wang wrote that Nicholson had "depressive and anxiety symptoms so these could lower her frustration tolerance and put her a bit at risk for workplace pressure at this time." Tr. 28, 439. Nicholson argues that Dr. Wang observed that Nicholson "appeared sad" and "anxious, with '[s]ome behavioral or autonomic signs of anxiety.'" Doc. 10, at 16. But the ALJ noted that Nicholson during the exam with Dr. Wang displayed "depressive and anxiety symptoms." Tr. 28. And the ALJ recited all of the statements Dr. Wang made that Nicholson cites. Tr. 28; Doc. 10 at 16–17 (listing Dr. Wang's findings that the ALJ listed above). Nicholson simply disagrees with the ALJ's

23

conclusion that Dr. Wang's exam findings described less than "significant limitations," *id*. at 17, but the ALJ's description was accurate.

Moreover, Nicholson doesn't specifically identify what limitations Dr. Wang found that would be "significant." Indeed, Dr. Wang's opinion didn't contain specific functional limitations—it only described conditional, vague limitations that Nicholson may have. Tr. 438–39. So it doesn't amount to a medical opinion about Nicholson's limitations. *See Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (finding that a doctor's statement wasn't a "'medical opinion' at all—it merely regurgitates Francis's self-described symptoms"); *Harden v. Comm'r of Soc. Sec.*, No. 16-12394, 2017 WL 4946580, at *8 (E.D. Mich. Aug. 24, 2017) ("The medical source statement's mere parroting of plaintiff's reported symptoms and complaints (as dictated by plaintiff the very day the statement was completed) oppugns its status as an actual medical opinion under the regulatory definition"). Nicholson hasn't shown that the ALJ "mischaracterize[ed]" Dr. Wang's opinion, or that he erred when he contrasted Dr. Wang's non-significant exam findings with Dr. Bell's assessed "marked" limitations, Tr. 28.

Finally, Nicholson argues that the ALJ erred when he evaluated Dr. Yakubek's opinion. Doc. 10, at 17.  The ALJ evaluated Dr. Yakubek's opinion as follows:

> In July 2024, the consultative physician opined the claimant could sit a couple hours[,] stand a couple hours and walk a couple of blocks and lift ten pounds. She did not have any substantial physical

limitations. Her medical conditions were well controlled on current medications and there were no acute symptoms that would suggest otherwise (5F).

The opinion from the consultative physician was partially persuasive since the opinion the claimant could only stand walk sit a couple hours and lift ten pounds was not supported by the examination that indicated she had no limitations in range of motion or muscle strength. She had a normal gait and normal coordination. She had no focal deficits (5F). The opinion the claimant had no substantial physical limitations in her functioning and her medical conditions were well controlled by her current medication and no acute symptoms that would suggest otherwise was supported by the benign findings on the consultative examination. Moreover, the opinion was consistent with the examinations performed by the primary care phys[i]cia[]n in the record (1F: 8F).

Tr. 29. Nicholson argues that the ALJ "fail[ed] to consider the supporting explanation of Dr. Yakubek." Doc. 10, at 18. She doesn't identify, however, what "supporting explanation" she's referencing. She cites her testimony at the administrative hearing, *id.*, but her testimony doesn't supply the "supporting explanation" for Dr. Yakubek's opinion. *See* 20 C.F.R. § 416.920c(c)(1). (defining supportability as the "relevant … objective medical evidence and supporting explanations presented by a medical source" in support of his or her opinion). The ALJ's explanation—that Nicholson's normal exam findings during Dr. Yakubeks's exam didn't support Dr. Yakubek's opinion that Nicholson could perform less than sedentary work—is proper and accurate.

*2. The ALJ's step five finding is supported by substantial evidence*

Nicholson argues that the ALJ's step five determination is unsupported by substantial evidence. Doc. 10, at 19. She says that the RFC limited her to occasional interaction with others, but the vocational expert testified at the administrative hearing that the jobs he identified had a two-week training period, during which time Nicholson "could" have more than occasional interaction with coworkers. *Id.*

The following exchange occurred at the administrative hearing:

> Q [Nicholson's attorney]: So, excuse me, first would these jobs—would the occasional interaction with supervisors or coworkers—would … the interaction be greater than that during the initial training period? Whether it's 60—
>
> A [Vocational expert]: No.
>
> Q: —or 90 days or what or 30 days, whatever their introductory period, would that be—would there be more interaction during that time?
>
> A: It's more interaction during the training period because usually on a buddy system for at least two weeks until you get familiar with the—acclimated with the climate and—and the job duties, because the job duties for unskilled you can learn in 30 days … but it—a lot of times, it's just getting acclimated with the worker—you know, the work environment.
>
> Q: Okay. But so you're saying it could be more than occasional interaction then during that time, since she'd be working with someone else?
>
> A: Right, during the training period, correct.

Tr. 68. Nicholson concludes that, based on this testimony, she could not

26

perform the jobs the vocational expert identified because the RFC limited her to no more than occasional interaction with others. Doc. 10, at 19. She claims that the vocational expert "essentially testified that the RFC would preclude all jobs found at Step 5 given there would be more frequent interaction than occasional during the training period." *Id*. at 19–20. And so, Nicholson says, "it is unclear how the ALJ determined" that Nicholson could perform the jobs linen room attendant, house cleaner, and cook helper. *Id*. at 20; Tr. 31.

The Commissioner points out that the RFC "is an assessment of the individual's ability to do sustained mental activities on *a regular and continuing basis*." Doc. 10, at 12 (emphasis added); *see* 20 C.F.R. § 416.945(b),(c) (explaining that the RFC described "work activity on a regular and continuing basis."). "And the mere possibility of something more than occasional, with a buddy, for approximately two weeks," the Commissioner contends, "is not inconsistent with only being able to interact occasionally on a regular and continuing basis." Doc. 11, at 12. Moreover, the Commissioner states, this questioning was "poorly developed" by Nicholson's counsel at the administrative hearing:

> Counsel elicited only the possibility of some amount of additional interaction for some short period of time, even though the hearing took place under Social Security Ruling (SSR) 24-3p[], which explains the agency's expectation that counsel develop points of contention.

*Id*.; *see* Social Security Ruling 24-3p; *Titles II and XVI: Use of Occupational Information and Vocational Specialist and Vocational Expert Evidence in*

27

*Disability Determinations and Decisions*, 89 Fed. Reg. 97,158 (Dec. 6, 2024) (effective Jan. 6, 2025), 2025 SSR LEXIS 1. Social Security Rule 24-3p provides:

> At the hearing level, when the claimant is represented, we expect the representative to raise any relevant questions or challenges about the VE's testimony at the time of the hearing and to assist in developing the record through appropriate questions to the VE.

2025 SSR LEXIS 1, at *8; *see id.* at *8 n.10 ("Raising relevant questions about or challenges to the VE's testimony at the time of the hearing, when the VE is ready and available to answer them, furthers the efficient, fair, and orderly conduct of the administrative decision-making process.") (citing 20 C.F.R. §§ 404.1740 and 416.1540).

In reply, Nicholson maintains that the vocational expert's testimony isn't substantial evidence to support the ALJ's step five finding. Doc. 12, at 2. As for SSR 24-3p, she concedes that the ruling "explains the agency's expectation that counsel develop points of contention," Doc. 12, at 2–3 (quoting Defendant's brief), but argues that "the government's attempt to assert issue preclusion by utilizing a Social Security Ruling—which lacks the safeguards afforded by the agency's rulemaking process, as would a regulatory change— is improper," *id.* at 3. Nicholson writes:

> Plaintiff asks the Court to note that Social Security Rulings are not offered for public consideration under the formal notice-and-comment rulemaking process, and that SSR 24-3p, was accordingly published as a "Notice of Social Security Ruling,"

28

rather than as a "Notice of Proposed Rulemaking" ("NPRM").[] Fashioning such a change as reflected here, under the guise of interpretation of established regulatory provisions—without divulging that the change would greatly alter substantive rights of claimants—is impermissible.[] … Plaintiff asserts that altering basic substantive rights of claimants— through a purportedly interpretive ruling—must not be allowed. As the Sixth Circuit has observed, "The APA sets different procedural requirements for 'legislative rules' and 'interpretive rules': the former must be promulgated pursuant to notice and-comment rulemaking; the latter need not." *Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018). "If an agency attempts to issue a legislative rule without abiding by the APA's procedural requirements, the rule is invalid." *Tennessee Hosp. Ass'n.*, 908 F.3d at 1042. *See also Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 617 (4th Cir. 2018). A Social Security ruling is not the appropriate tool to effect such a change as this. It is Plaintiff's position that— given the manner in which the Commissioner attempts to wield it in the case at bar—SSR 24-3p must be properly characterized as a legislative rule, because application of its waiver provision would result in substantive changes both for claimants' duties to raise issues at the administrative hearing level and for claimants' access to judicial review.

Doc. 13, at 3–4. Nicholson concludes that "[t]he mere presence of 24-3p in this case should require remand." *Id*. at 3.

First, Nicholson's challenge to the ALJ's application of SSR 24-3p is improper because she raised it for the first time in her reply brief. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) ("Time, time, and time again, we have reminded litigants that we will treat an 'argument' as 'forfeited when it was not raised in the opening brief.'") (citation omitted)).

29

Although Nicholson frames her argument as a response to the Commissioner's brief, the ALJ wrote that he adopted the vocational expert's testimony "in accordance with SSR 24-3p." Tr. 32. So Nicholson should have raised any challenge to the ALJ's reliance on SSR 24-3p in her opening brief, which she failed to do.[7] She has therefore forfeited her SSR 24-3p challenge.

In any event, in light of the exemption in 5 U.S.C. § 553(b) for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," Social Security Rulings need not be promulgated through notice-and-comment rule making. *See Taylor v. Sec'y of Health & Hum. Servs.*, 922 F.2d 841 (Table), 1991 WL 1104, at \*1 (6th Cir. 1991); *cf. Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 810 n.12 (6th Cir. 2018) ("As Social Security Rulings presumably lack the force of law, they do not warrant *Chevron* deference.").

Moreover, as the Commissioner says, Nicholson's attorney did not develop this point at the administrative hearing. Nicholson claims that the vocational expert "essentially testified that the RFC would preclude all jobs found at Step 5 given there would be more frequent interaction than occasional during the training period." Doc. 12, at 4; *see id.*, at 2 (stating that Nicholson "clearly would have to go through a training period on any job and the mere possibility of over occasional interaction would preclude work according to the

---

[7]     Nicholson didn't raise this issue when she appealed the ALJ's decision to the Appeals Council, either. Tr. 367–68.

30

RFC."). But this is too broad a reading of the vocational expert's testimony—the vocational expert was not asked, nor did he state, that Nicholson couldn't perform any jobs or could not weather a two-week training period for the specific jobs he identified. Nor did he say how much additional contact, and how often, Nicholson would be expected to experience during a training period.[8] Tr. 68 (vocational expert agreeing that during a two-week training period there "could be more than occasional interaction" with others); *see, e.g., Dean v. Berryhill*, No. 1:17-cv-01297, 2019 WL 1170479, at \*5 (E.D. Cal. Mar. 13, 2019) (rejecting the claimant's argument because "[t]he VE did not testify that someone with a limitation to occasional interaction with supervisors could not get past the training time for the representative jobs. Rather, the VE suggested that during the training time, there *may be* more than occasional contact with a supervisor.").

Nicholson has not cited legal authority to support her assertion that vocational expert testimony regarding an unidentified amount of increased exposure to others during a two-week training period renders insubstantial the vocational expert testimony on which an ALJ relies. Legal authority indicates

---

[8]     Counsel's failure to pursue this point at the hearing is puzzling. *See* 3 Soc. Sec. Disab. Claims Prac. & Proc. § 27:83(B) *Examples of when to file posthearing briefs* (2nd ed. updated Oct. 2025) (commenting that, "[f]or this argument [regarding a probationary period preclusion] to work," the claimant's representative must "focus ... on the jobs the VE identified, not all jobs in general," and expressly ask the vocational expert whether the hypothetical individual could perform the identified jobs despite the probationary period, and providing a detailed "script" for a representative to follow).

otherwise. *See* 20 C.F.R. § 416.945(b),(c) (explaining that the RFC describes "work activity on a *regular and continuing basis*.") (emphasis added); *Wright v. Comm'r of Soc. Sec.*, No. 1:12-cv-1103, 2013 WL 3873947, at *3 (N.D. Ohio July 25, 2013) ("[U]nder Plaintiff's theory, every single time an individual is limited to superficial interactions with others, the result would require an ALJ to determine that the claimant is entitled to benefits since training for a job necessarily involves more than superficial interaction with others. Such a result is untenable."); *see also Rebecca L. v. Comm'r of Soc. Sec.*, 617 F. Supp. 3d 256, 273 (D.N.J. 2022) (noting that courts in that district "routinely" reject arguments that "an interaction level during a probationary training period that briefly exceeds occasional undermines a plaintiff's RFC") (citation omitted); *see Robin S. v. Comm'r of Soc. Sec.*, No. 24-cv-06904,  2025 WL 1431084, at *10 (D.N.J. May 19, 2025) ("Here, the VE acknowledged that interaction levels during training may exceed occasional, but this does not create an apparent conflict under SSR 24-3p, … which clarifies that the DOT reflects 'maximum requirements of occupations as generally performed.'… Because the potential for elevated interaction is limited to an initial probationary period and does not conflict with the DOT's characterization of the job as generally performed, no further explanation was required from the ALJ."); *Suchini v. Comm'r of Soc. Sec.,* No. 8:24-cv-01467, 2025 WL 913765, at *3 (M.D. Fla. Mar. 26, 2025) ("The VE's testimony that a supervisor might give

32

extra instructions for 'maybe a week' does not undermine the ALJ's conclusion that Suchini could perform work where such interaction was only occasional.").

In sum, Nicholson didn't develop this issue during the administrative hearing, as Social Security Ruling 24-3p requires, and she hasn't shown that the ALJ's reliance on vocational testimony at step five was not supported by substantial evidence.

**Conclusion**

For the reasons explained above, I affirm the Commissioner's decision.


Dated: May 6, 2026

*/s/ James E. Grimes Jr.*

James E. Grimes Jr.
U.S. Magistrate Judge

33